CENTRAL TRUST CO. OF NEW YORK v. COLORADO MIDLAND RY. CO.
(DENVER & R. G. R. CO., Intervener).

(Circuit Court, D. Colorado. October 11, 1898.)

1. RAILROADS—TRACKAGE LEASE—CONSTRUCTION AND OPERATION.

A railroad company owning a track between two points entered into a contract with another company, denominated a lease, by which the latter company was given the right to the joint use of the tracks, in consideration of the payment of certain rental and a proportion of the expense of maintenance, the contract providing that "said railroad shall be operated by the parties hereto jointly." Each company ran its own trains and employed its own trainmen, uniting only in the employment of a superintendent having charge of the movement of trains, of trackmen, and station agents, who served both companies. *Held*, that the contract was merely a lease of trackage rights, for the joint use of the physical structure of the road, and not a merging of the business of the two companies, and that the lessee was liable to the lessor for loss and damages sustained and liabilities incurred by it by reason of a collision caused by the negligence of the trainmen of the lessee in failing to obey the orders of the joint superintendent.

2. SAME—PAYMENT OF CLAIMS BY RECEIVER—SUFFICIENCY OF PROOF.

Where a receiver operating a railroad acts in accordance with the common usage of the business in paying claims for express matter destroyed in a collision upon affidavits as to its value, such evidence will be accepted as sufficient by the court.

On exceptions to the report of the master fixing the liability, as between the defendant railroad companies, for losses growing out of a collision between trains.

Henry T. Rogers, for Colorado Midland Ry. Co.
Grove & N. Ristine, for receiver.
Henry T. May, for intervener.

Before BREWER, Circuit Justice, and CALDWELL, Circuit Judge.

BREWER, Circuit Justice. We have carefully considered the elaborate arguments of counsel, and have come to a conclusion in which we both agree. I have not had time to fully explain to my Brother CALDWELL the line of thought I have pursued, and so, after hearing my statement, perhaps he may desire to add to or subtract from it.

The status of the case is, briefly, this: The Rio Grande Company and the Midland Company each had a line of road extending from the eastern part of the state westward to Newcastle. The Rio Grande Company (called the "Denver Company" hereafter) also owned a track from Newcastle to Rifle Creek. The Midland Company owned

nothing west of Newcastle. Neither had a road west of Rifle. Each wanted to reach Grand Junction. In that state of the case the Junction Company was organized to build a road from Rifle to Grand Junction. A contract was made between the Denver and the Midland Companies for the joint use of the track from Newcastle to Rifle. Contemporaneous with it was a contract between the Denver and the Midland Companies on the one side and the Junction Company on the other. Yet the contracts and the rights created by each are separate. The accident which is the foundation of this litigation took place on the track between Newcastle and Rifle, on the track covered by the first contract. And I may premise that the question is not what rights or liabilities might have resulted if this accident had happened west of Rifle, on the track covered by the last contract; nor are we put to an inquiry as to what would be the respective liabilities if the negligence causing this accident had been that of the joint superintendent, for it was, as clearly shown, the negligence of those who were the special employés of the Midland, neither employed nor paid on joint account, but employed and paid by the Midland Company alone.

What was the contract between the Denver and the Midland Companies as to this track? It is denominated by the parties a lease. It recites that the Denver Company owns a railroad extending from Newcastle to Rifle Creek, and provides that the Midland Company "hath this day leased and demised an equal undivided moiety in and to all the right of way and railroad of the Denver Company, *   *   * not including, however, any rolling stock." The promise and agreement of the Midland Company was to pay as rental for this physical structure a certain amount, and also a certain proportion of the expense of maintenance. Stopping right there, the contract was not one for merging the business of the two companies, but simply an ordinary lease of trackage rights; that is, the joint use of the physical structure. The character of such a contract, called by the parties a lease,—in effect a lease,—is not affected by the way the rental may be fixed, whether a gross sum, a per cent. of the gross receipts, on the wheelage basis, or in any other way. The contract is simply one of lease of the physical structure, and not a merger of the business of the two companies.

The contract provides that the "said railroad [that is, the line between Newcastle and Rifle] shall be operated by the parties hereto jointly." What meaning is to be given to the term "railroad"? The word may include all that is involved in the business of moving passengers and freight over a physical structure, and it is urged that it here has that broad significance. But the language of the lease plainly limits it. There was no merger of the business of the two carriers of passengers and freight. Each fixed its own tariff; each employed and paid its own trainmen; each discharged them as it saw fit. All that was included within the term "railroad" was the physical structure. And the stipulation amounts simply to this: that that physical structure shall be used jointly under such methods and modes as may thereafter be agreed upon between the parties. With that as a basis, the companies, according to the usage as shown, and

not according to the terms of any written agreement, arranged that the movement of the trains, the use of this physical structure, should be under the control of a single superintendent selected by the two—paid by the two—companies. The particular method of use is immaterial,—whether under the direction of a joint superintendent named by the two parties for this particular track, or of the general superintendent of the one road, or in obedience to certain fixed and prescribed rules. All these ways mean simply this: that, having regard to the possibility of accident, to prevent any conflict in the operation of the trains of the two companies, there should be either some fixed rule, or some single officer whose decisions and orders should control. Such operation by the two roads of the single track is not thereby lifted into a partnership or other joint proprietary interest. And it makes no difference that, for purposes of economy, the station agents along this single track may have served both companies. The telegraph operators and certain other officials, the trackmen engaged in keeping up the physical structure, may have been paid by the two companies jointly, and upon an agreed basis. It still remains the fact that the case is one of a lease by the owner of a track of a partial use of that track to another, and the details agreed upon are simply such as common prudence suggests in order that the use by the two companies of the single track may be without danger to either. The trainmen employed by either company and operating its train never become the servants or employés of any other master than the company which hires and pays them. If a company, sole owner of a track, says to its employés that within certain limits they must obey the orders of a particular man, one who has no proprietary interest, no contract right or benefit from the management of the property, it does not thereby make them the servants of that designated party. They still remain the servants of the master who hired them, and in obedience to his orders temporarily obey the commands of this designated superintendent. So the employés, the special employés of the single company, the Midland Company, the trainmen on this train which caused the injury, when they entered upon this track thus jointly used, although temporarily subject to the orders of a superintendent that had been designated by the two companies, remained still the employés and servants of the Midland Company. They were not turned over to the service of an independent party. Their acts, therefore,—their negligence,—are the acts and the negligence of their employer, and not of Mr. Choate, nor of some supposed third party.

The contract is silent as to what responsibilities, individual or joint, shall flow from the negligence or misconduct of the separate employés of either party; and so we must come back to the general rules of law applicable to a case of this kind. And the inquiry presented is, not whether, by virtue of their joint occupation of this track, both companies are responsible to a third party, but what are their responsibilities and rights as between themselves. We may regard it in the light of contract. Taking the usage as well as the written agreement, both of which are silent as to responsibilities, and there is a contract between the Denver Company and the Midland Company that each will place its trains on this track with its separate

employés under an implied promise that those employés will obey the orders of the selected superintendent. The testimony shows that orders issued by this selected superintendent were obeyed by the employés of the Denver Company, and disregarded by the employés of the Midland Company. If the employés of either company fail to obey such orders, the company whose employés thus fail to obey becomes responsible to the other for the breach of that contract. So, if it be true, as the testimony shows and the master finds,—and, we think, rightly,—that the trainmen of the Midland Company, the separate and special employés and servants of that company, in the management of that company's train on this single track, disobeyed the orders of the selected superintendent, and that disobedience resulted in loss to the Denver Company, then the obligations of the contract cast the burden of that loss upon the Midland Company, whose employés (and the acts of the employés are the acts of the company) broke the contract.

Some minor matters emphasize this conclusion. It appears that the usage was that, if stock was killed on this track thus jointly used, and it was shown that the stock was killed by the train of one company, that company paid for the loss. There was no joint responsibility. On the other hand, if it did not appear by the train of which company the stock was killed, then, as it was an injury caused in the use of the track, with no certainty as to which company's train did the injury, the expense was divided on the same basis as other expenses. That amount passed into the expense of maintenance of the track, which, by the express terms of the contract, was to be divided on a wheelage basis.

So, in reference to the hiring and discharging of employés. The trainmen were hired and paid by the respective companies. Neither did the joint superintendent exercise the power of employing or discharging the trainmen. Confessedly, he employed none, and while in the testimony of Mr. Ridgeway and Mr. Choate and Mr. Bryant there is perhaps some confusion in the use of terms, it seems to us perfectly clear that the power exercised by Mr. Choate, the joint superintendent, was a power appropriately belonging to one placed by the two companies in charge of that particular line,—that of recommending the discharge, suspension, or discipline of employés. The letters which are in evidence all run in the line of recommendation, a recommendation which, of course, was respected, ought to have been, must have been, in order to preserve the safe management of a single line thus jointly used; but always it was upon the recommendation, and not upon the command, of Mr. Choate, that employés were discharged, suspended, or disciplined. These things only emphasize the fact that, so far as the business of these two companies was concerned, it was a separate business, independent in all possible features, and only touching each other in that for a certain length of track the two companies placed their trains upon a line leased by one to the other.

Without going further into detail, or enlarging upon minor matters, these thoughts have led my mind to the conclusion that the trainmen of the Midland Company running the train which caused this collision were still the servants and employés of the Midland Com-

pany, for whose misconduct and negligence that company is liable; and, although the Denver Company, as a carrier of passengers, will be, and rightfully is, primarily responsible to those passengers, and also to those who placed express matter on its train, yet, as between the two companies, the obligations of the contract justify and require that the Midland Company shall respond to the Denver Company for whatever pecuniary loss it has sustained by that collision.

Some other minor matters are presented. First, the question of insurance. I think it enough to say in respect to that matter that the general law of insurance is that it is a personal contract between the insurer and the insured, the benefits of which cannot be appropriated by a wrongdoer; and whatever exceptions will be found to that rule do not reach a case of this kind.

In respect to express matter the testimony shows that the Denver Company has, in accord with the ordinary course of dealing on the part of railroad and express companies, paid losses, the amount of which has been fixed, not by a judicial trial, but upon affidavits furnished by the shippers. I think a receiver is justified—is bound—to operate a railroad placed in his hands according to the ordinary laws which control the management of like corporations in the hands of their owners; and, while it may be proper for the receiver to present the question to the court, I am clear that it is the duty of the court to recognize that the common course of business is obligatory, and whatever an ordinary railroad or express company, in the management of its business, recognizes as sufficient evidence of value, should, when it comes before a court, be recognized as equally satisfactory. And so, although there was in respect to those express packages no adjudication upon oral testimony as to the value of the packages destroyed, this court should take the action of the Denver Company as satisfactory proof of the amount of such loss.

I do not know that it is necessary for me to say more, and yet, perhaps, I may add a word in reference to the agreement made between the Midland and the Denver Companies on the one hand and the Junction Company on the other, and only for the sake of pointing out why that contract does not aid the Midland Company in this contention. The Junction Company was organized to construct a road from Rifle to Grand Junction. This agreement recites that the Denver Company and the Midland Company were seeking entrance to Grand Junction; that the Denver Company, besides its eastern properties, owned a track from Newcastle to Rifle, and had leased the joint use of that track to the Midland Company. So both companies had arranged for track to Rifle. It further provides that the Junction Company shall build from Rifle to Grand Junction, that it shall issue a certain amount of bonds to be jointly guarantied by the Denver and the Midland Companies, and that those two companies shall lease that track— that physical structure—from Rifle to Grand Junction. Details in respect to what is to be constructed, what is to be done in the way of increase, what rental is to be paid, are to my mind wholly insignificant and immaterial, so far as this question is concerned. But what did this Junction Company agree to lease? Not a railroad, in the full sense of the term, including rolling stock and track, but sim-

ply the physical structure which it was to build. It was the lessor, to these two lessees jointly, of the use of that track for a stipulated rental.

The fifth clause provides that the Denver Company and the Midland Company further agree "that they will operate the railroad hereby demised or agreed to be demised to them on joint account under such provisions as to method of operation as may be hereafter mutually agreed upon between them, and in connection with the railroad of the Denver Company between Rifle Creek and Newcastle, an undivided moiety of which the Denver Company has agreed to lease to the Midland Company, as above recited." What were they to operate? A railroad in the fullest sense of the term? No, for that had not been demised; but only the physical structure upon which the railroad business might be transacted. That was all which was demised; that was all which was to be jointly operated. So that there is nothing in that which tends to enlarge the scope of the contract of lease between the Denver and Midland Companies; nothing to make it other than it appears upon its face, an agreement for the lease of the physical structure, a provision for the running of the trains of the separate companies on that single track.

My conclusion is that the exceptions made by the Midland Company to the report of the master must be overruled, and the single exception suggested by the Denver Company in reference to express matter must be sustained.

With regard to the terms of the decree, I have not had a chance to speak to Brother CALDWELL, but I gather from his observations yesterday that his thought would be with mine, that the counsel for the Denver Company should prepare the form of a decree, and submit it to the counsel for the Midland Company, and if in the phraseology there is anything upon which they do not agree it can be submitted to us for correction.